Approved: _____        **17 MAG    8556**
          DINA MCLEOD/CHRISTOPHER HARWOOD
          Assistant United States Attorneys

Before:   HONORABLE KEVIN NATHANIEL FOX
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA              :    **SEALED COMPLAINT**
                                      :
       - v. -                         :    Violations of
                                      :    18 U.S.C. §§ 641, 1343
ALEXANDER NEUMEISTER,                 :
                                      :    COUNTY OF OFFENSE:
                     Defendant.       :    New York
                                      :

- - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

          FRANK P. PAPPALARDI, being duly sworn, deposes and
says that he is a Special Agent with the Department of Health
and Human Services, Office of Inspector General ("HHS-OIG"), and
charges as follows:

COUNT ONE
(Theft of Government Funds)

          1.    From at least in or about 2012, up to and
including in or about 2014, in the Southern District of New York
and elsewhere, ALEXANDER NEUMEISTER, the defendant, embezzled,
stole, purloined and knowingly converted to his use and the use
of others, vouchers, money, and things of value of the United
States and a department and an agency thereof, to wit, the
United States Department of Health and Human Services, the value
of which exceeded $1,000, and received, concealed, and retained
the same with intent to convert it to his use and gain, knowing
it to have been embezzled, stolen, purloined, and converted, to
wit, NEUMEISTER used his position as a nationally prominent
researcher into neurological disorders to convert federal grant
money to which he had access to his own use by spending it on,

among other things, airline tickets, lodging, and other personal expenses for his family members and so that he could visit with and entertain a social acquaintance who lived out of state.

(Title 18, United States Code, Section 641.)

COUNT TWO
(Wire Fraud)

2.      From at least in or about 2012, up to and including in or about 2014, in the Southern District of New York and elsewhere, ALEXANDER NEUMEISTER, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, NEUMEISTER, while serving as a researcher into neurological disorders, made fraudulent misrepresentations regarding the nature of tens of thousands of dollars of personal expenses in order to obtain reimbursements for such expenses from both federal grant money and funds belonging to the medical school for which he worked, and furthered that fraud through the use of interstate wires.

(Title 18, United States Code, Section 1343.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

3.      I have been personally involved in the investigation of this matter.  This affidavit is based upon my conversations with law enforcement agents, witnesses and others, as well as my examination of reports and records.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**OVERVIEW OF THE CHARGES**

4.      As set forth more fully below, ALEXANDER NEUMEISTER, the defendant, was at all times relevant to this Complaint a Professor in the Department of Psychiatry of a

2

medical school located in the Southern District of New York (the
"School"), and a principal investigator for a variety of
research studies, including studies funded by the National
Institute of Mental Health ("NIMH"), an agency of the U.S.
Department of Health and Human Services.  NEUMEISTER was
provided a credit card by the School, known as a procurement
card (the "P-Card"), and was authorized to charge research
study-related expenses to the P-Card.  During the period from in
or about 2012 to in or about 2014, NEUMEISTER used the P-Card to
charge tens of thousands of dollars of personal expenses,
including trips for family members, trips and meals for himself
and a friend (the "Friend"), and an iPhone for the Friend, and
then fraudulently classified those expenses as work-related,
thus causing the School to pay for them with NIMH grant funds or
its own funds.  Among other expenses, NEUMEISTER used government
funds to pay for eight roundtrip flights from New York City to
Salt Lake City, Utah, to visit the Friend.  In addition,
NEUMEISTER falsely claimed that the Friend was a research study
participant in studies that Neumeister was overseeing for the
School, and caused the School to pay over $10,000 of the
School's own funds directly to the Friend. In total, NEUMEISTER
used tens of thousands of dollars in NIMH and School funds to
pay for personal expenses and then fraudulently classified those
expenses as related to his research studies.  As of the date of
this Complaint, NEUMEISTER has not repaid any of the
misappropriated funds.

### THE FRAUDULENT SCHEME

        5.    From my review of records obtained from the
School, and interviews with employees of the School who worked
at various times for or with ALEXANDER NEUMEISTER, the
defendant, I have learned, among other things, that:

            a.    On or about December 1, 2011, NEUMEISTER was
hired by the School.  During his time as an employee of the
School, NEUMEISTER held the academic rank of Professor in the
Department of Psychiatry, with a starting annual pay rate of
$230,000 per year.

            b.    During the time NEUMEISTER was employed by
the School, from in or about December 2011 through in or about
March 2015, the School received grant funding from NIMH for a
variety of research studies for which NEUMEISTER served as the
principal investigator.  The studies concerned stress-related
disorders, including post-traumatic stress disorder.  As the
principal investigator for these research studies, NEUMEISTER

was responsible for overseeing the studies, including the collection, analysis, and interpretation of the study data.

      6.    From my interviews of members of the Department of Psychiatry at the School, and my review of documents provided by the School, I have learned, among other things, that:

      a.    ALEXANDER NEUMEISTER, the defendant, was issued a P-Card in or about June 2012.  In connection with his receipt of the P-Card, NEUMEISTER signed a statement acknowledging that he had read and understood the Cardholder Agreement for the P-Card, the specific terms and conditions of which included: (1) that his use of the P-Card would be for "making financial commitments on behalf of [the School]"; (2) that the School would be liable for all charges made on the P-Card; (3) that use of the P-Card was "for approved purchases only"; and (4) that if the P-Card was used "for personal items," NEUMEISTER "must forward a check, made payable to [the School], along with [the] monthly statement."

      b.    At all times relevant to this Complaint, NEUMEISTER provided, or caused others to provide, written justifications to the School for the charges he made using his P-Card.  NEUMEISTER also identified, or caused others to identify, to which specific grant or other funding source the P-Card charges should be allocated.  The written justifications were entered into an electronic database that was maintained by the School (the "Database").

      c.    In identifying the grant or other funding source to which a particular expense should be allocated, NEUMEISTER was able to allocate, or cause others to allocate, the expenses to specific grants, including NIMH grants, or to one or more expense accounts maintained by the School.

      d.    To the extent NEUMEISTER allocated, or caused others to allocate, a particular expense to a specific grant, the School would pay the expense using funds obtained from the grant source.  Therefore, in instances where NEUMEISTER allocated, or caused others to allocate, a particular expense to an NIMH grant, the School would pay the expense using funds obtained from NIMH.

      e.    To the extent that NEUMEISTER allocated, or caused others to allocate, a particular expense to an expense account maintained by the School, the School would pay the expense using its own funds.

7.     From my review of credit card records associated with the P-Card and documents provided by the School, interviews with employees of the School who worked with ALEXANDER NEUMEISTER, the defendant, and my review of documents obtained through court-issued search warrants for social media accounts used by the Friend, I have learned, among other things, that in the period from in or about 2012 up to and including in or about 2014, ALEXANDER NEUMEISTER, the defendant, used the P-Card to charge tens of thousands of dollars in expenses that I have determined based on the investigation to be personal in nature and unrelated to NEUMEISTER's research studies or his employment at the School.    Nevertheless, NEUMEISTER falsely classified, or caused others to falsely classify, these expenses as related to his research or for business purposes related to his position at the School, which resulted in the expenses being paid with NIMH funds or the School's own funds.   For example:

### P-Card Charges for Expenses Associated With the Friend

8.     From my review of publicly available information and emails obtained from the School, I have learned that the Friend was a professional ballet dancer who lived in New York City for a portion of 2012.   Thereafter, and for the remainder of the time that ALEXANDER NEUMEISTER, the defendant, was employed at the School, the Friend lived in Charlotte, North Carolina, and later in Salt Lake City, Utah.

9.     From my review of records for the P-Card, interviews with School employees, and review of documents obtained from the School, I have learned that:

a.     From the period in or about September 2012 up to and including in or about September 2014, ALEXANDER NEUMEISTER, the defendant, used his P-Card to pay for the Friend to travel to New York City, where NEUMEISTER lived.   For example, in the period from in or about December 2013 up to and including in or about October 2014, P-Card records reflect that NEUMEISTER used the P-Card to purchase more than $2,300 worth of airline tickets for the Friend to travel from Salt Lake City to New York City.   Entries in the Database for these expenses indicated that the airline tickets were for a "participant" or "subject" in three of the federally funded studies for which NEUMEISTER was then serving as the principal investigator.   From my interviews of individuals who were employed to assist NEUMEISTER in his research and my review of documents obtained from the School, I have learned that the Friend was not an approved participant or subject in any of the studies that NEUMEISTER was overseeing for the School.   NEUMEISTER allocated,

or caused others to allocate, the full amount of these expenses
to NIMH grants, thus causing NIMH to pay for the expenses.

      b.    In addition to using the P-Card to pay for
the Friend to travel to New York City, NEUMEISTER used the P-
Card to pay for airline tickets and other travel-related
expenses so that the Friend could travel to other locations.
For example, P-Card records reflect that NEUMEISTER used the P-
Card to pay for airfare for the Friend to travel to Miami,
Florida, on May 13, 2014, and to stay at a resort hotel in Miami
Beach, from May 13 through 22, 2014.  Emails obtained from the
School reflect that NEUMEISTER gave credit card authorization to
the hotel to allow the Friend to charge, among other things,
food, beverages, and beach facilities to NEUMEISTER's P-Card.
NEUMEISTER allocated, or caused others to allocate, the expenses
for this trip, more than $4,300, to a School expense account,
and represented, or caused others to represent, in the Database
that the expenses were incurred for a study "subject,"
notwithstanding that the Friend was not an approved subject in
any of the studies NEUMEISTER was overseeing for the School.

      c.    NEUMEISTER also used the P-Card to pay for
his own travel to visit the Friend.  For example, P-Card records
reflect that in the period from in or about July 2013 up to and
including in or about November 2014, NEUMEISTER used the P-Card
to purchase at least eight roundtrip airline tickets, for a
total of $9,200.30, for NEUMEISTER to travel from New York City
to Salt Lake City, where the Friend was then living.[1]  On these
occasions, NEUMEISTER also used his P-Card to pay for lodging,
bar tabs, meals, and other expenses, including a lunch for two
at the Waldorf Astoria hotel restaurant in Park City, Utah, on
March 2, 2014.[2]  NEUMEISTER entered, or caused others to enter,
into the Database descriptions classifying these expenses as
related to NEUMEISTER's research or for business purposes
related to his position at the School.  Moreover, NEUMEISTER

---

[1] From documents provided by the School, I learned that, when
asked by representatives of the School whether he had personal
reasons to visit Salt Lake City multiple times, NEUMEISTER said
that he knew the Friend lived there, but claimed that visiting
the Friend was not the reason for his travel to Salt Lake City.

[2] From my review of the contents of an online social media
account of the Friend, obtained pursuant to a search warrant, I
have learned that on March 2, 2014, the Friend posted on social
media a picture of a plate of food with the following text:
"Lunch at the Waldorf Astoria in park city #life #love #parkcity
#waldorf #Sunday #lunch #meat."

allocated, or caused others to allocate, the $9,200.30 in
airline expenses referenced above to NIMH grants, and the cost
of the lunch at the Waldorf ($120.56) to a School expense
account, thus causing NIMH and the School to pay for these
expenses.  I believe these descriptions to be fraudulent
because, among other things, School employees who worked on
NEUMEISTER's research studies at the time of the above-
referenced travel have informed me that NEUMEISTER did not have
any reason to go to Salt Lake City in connection with the
studies he was overseeing for the School.  In addition, the
explanation that NEUMEISTER provided to representatives of the
School in early 2015 when questioned about his many trips to
Salt Lake City — that he had traveled there to determine the
suitability of the site for a future clinical trial to be funded
by the Department of Defense (the "DOD") — is not credible.
This explanation is belied by, among other things: (1) the sheer
number of NEUMEISTER's trips to Salt Lake City (at least 10
during an 18 month period)[3]; (2) the fact that several of the
trips took place largely or entirely over a weekend; (3)
NEUMEISTER's decision to allocate a substantial amount of the
expenses for these trips to NIMH grants (as opposed to DOD
grants); and (4) the fact that the descriptions that NEUMEISTER
entered, or caused others to enter, into the Database for the
expenses associated with many these trips reported that trips
involved meetings with a particular individual affiliated with a
particular university in Salt Lake City with whom NEUMEISTER did
not in fact meet during any of the trips.

       d.  P-Card records reflect that NEUMEISTER used
the P-Card to pay for roundtrip airline tickets so that he could
travel from New York City to Chicago, Illinois, on October 4,
2013, and from Chicago back to New York City on October 5, 2013.
NEUMEISTER's entry for this trip in the Database states that the
trip was for a "meeting" at a particular school in Chicago.
Yet, in an email dated September 29, 2013, NEUMEISTER told an
acquaintance that he was going to Chicago the following week to
see the Friend perform in a ballet; NEUMEISTER wrote:  "[The
Friend] is with [a] ballet [company] in Salt Lake City, next
week they [t]our to Chicago with sleeping beauty and I will see

---

[3] In addition to the eight roundtrip airline tickets referenced
above (which were paid with NIMH funds), P-Card records reflect
that, during the period from in or about August 2013 through in
or about December 2014, NEUMEISTER also used his P-Card to
purchase airline tickets for at least two additional trips to
Salt Lake City (which were paid with funds from one or more
School expense accounts).

them performing, then [the Friend] spends a week in NYC before returning to SLC [Salt Lake City]."

e.   In the period from in or about June 2012 up to and including in or about March 2014, NEUMEISTER incurred more than $1,000 in expenses for what I believe to be meals with the Friend and a new iPhone for the Friend.   For example, P-Card records reflect that during the above-referenced period, NEUMEISTER charged the cost of a lunch at a restaurant in New York City on January 15, 2013 ($83.13), a dinner at another restaurant in New York City on July 9, 2013 ($184.25), and a new iPhone on June 17, 2012 ($597.72) to his P-Card.   NEUMEISTER allocated, or caused others to allocate, the expenses associated with these charges to one or more School expense accounts, and entered, or caused others to enter, justifications for these expenses into the Database, describing the meals as being with two different work-related colleagues, and the iPhone purchase as: "Old equipment broke and could not be repaired. [G]iven my extensive travel and off site PET/MR imaging . . . [,] I nee[d] to stay connected with 2 separate study teams."   I believe that these justifications were false because, with respect to the meals, on the same day that the meals took place, NEUMEISTER forwarded emails he had received confirming reservations for two at the restaurants to the Friend's Yahoo France email account. Moreover, NEUMEISTER purchased the iPhone immediately after having a lengthy email exchange with the Friend during which the Friend reported that the Friend's phone had been stolen.   After purchasing the iPhone, NEUMEISTER forwarded the Friend an email from the Apple Store that began, "Welcome to your new iPhone."

### P-Card Charges Associated With NEUMEISTER's Family

10.   In the period from in or about January 2014 up to and including in or about November 2014, NEUMEISTER incurred thousands of dollars in expenses for domestic and international travel for members of his family.   Although this family travel was unrelated to NEUMEISTER's work at the School, NEUMEISTER paid for the travel with his P-Card and caused the cost of the travel to be paid for by NIMH and the School by falsely identifying, or causing others to falsely identify, those expenses as research-related.

a.   For example, P-Card records reflect that NEUMEISTER used his P-Card to purchase roundtrip airline tickets for his wife so that she could travel from Newark, New Jersey, to Vienna, Austria, in January 2014, and from Hartford, Connecticut, to Washington, D.C., in November 2014, for a total cost of $2,079.88.   NEUMEISTER described, or caused others to

describe, this travel in the Database as being for the following purposes: "collaboration recruitment account [associated with a particular school]" (January 2014 travel) and "Flight to DC 101663"[4] (November 2014 travel). I believe those descriptions to be false because, based on my review of records obtained from the School, NEUMEISTER's wife was not an approved collaborator on any of the studies that NEUMEISTER was overseeing while at the School. Moreover, records obtained from the School reflect that when questioned by the School in or about February 2015 about some of the travel expenses that appear to have been for members of his family, including the above-referenced January 2014 airline tickets to Vienna, NEUMEISTER (i) admitted that the expenses were in fact for his family and were unrelated to his work at the School; and (ii) identified the purpose of the January 2014 airline tickets to Vienna as being so his wife could attend her father's funeral. NEUMEISTER allocated, or caused others to allocate, the costs associated with the above-referenced airline tickets to Vienna and Washington, D.C., to an NIMH grant and one or more School expense accounts, thus causing them to be paid for by NIMH and the School.

b.    P-Card records reflect that in or about March 2014, NEUMEISTER purchased more than $1,100 in roundtrip airline tickets for his wife and children to travel from New York City to Stowe, Vermont. NEUMEISTER described, or caused others to describe, this travel in the Database as "PTSd study pre meeting recruitment account," and he identified it, or caused others to identify it, as relating to his work at the School. I believe this description to be false because records obtained from the School reflect that when questioned by the School about these expenses in or about February 2015, NEUMEISTER acknowledged that the tickets were for his wife and children and that they should not have been charged as a research expense to his P-Card.

## Payments to the Friend for the Friend's Alleged Participation in Research Conducted by NEUMEISTER

11.    I have spoken with School employees who worked for ALEXANDER NEUMEISTER, the defendant, during the period described in this Complaint, and I have also reviewed documents from the School relating to payments that the School made to the Friend for the Friend's alleged participation as a human study subject in research studies conducted by NEUMEISTER, and from

---

[4] The School used the number identifier "101663" to refer to one of the NIMH studies that NEUMEISTER was overseeing while at the School.

those interviews and documents, I have learned, among other
things, that:

        a.    Individuals who participated as human study
subjects in research studies conducted by NEUMEISTER received
compensation for their participation in those studies.  Even
though the Friend was not an approved subject in any of the
studies that NEUMEISTER was overseeing for the School,
NEUMEISTER caused forms to be created so that the Friend would
receive payments from the School for the Friend's purported role
as a study subject.  Certain of the forms falsely indicated that
medical imaging procedures were performed on the Friend in
connection with NEUMEISTER's research studies.  I have reviewed
records obtained from the School indicating that in the period
from in or about May 2012 up to and including in or about
September 2014, the School issued checks in the name of the
Friend, at NEUMEISTER's request, totaling more than $10,000.
The funds used to pay the Friend were from one or more School
expense accounts.

        b.    Four of the checks that were issued to the
Friend listed NEUMEISTER's residential address at the time as
the Friend's address, and NEUMEISTER himself endorsed for
payment two of the checks that were issued in the name of the
Friend.

### NEUMEISTER's Admissions to Fraudulent Expenditures

        12.    I have spoken with an employee of the School who
supervised ALEXANDER NEUMEISTER, the defendant (the
"Supervisor"), and who interviewed NEUMEISTER in or about
January 2015, after other employees of the School conducted an
audit of NEUMEISTER's expenditures using the P-Card.  From that
conversation, I have learned that during NEUMEISTER's interview
with the Supervisor, the following occurred, in substance and in
part:

        a.    NEUMEISTER asked that the audit findings not
be disclosed because it would jeopardize his job and his
children's ability to attend the School without having to pay
tuition.

        b.    NEUMEISTER offered to pay back certain of
the funds that he had charged to the P-Card.

        13.    From my review of documents provided by the
School, I have learned that on or about February 18, 2015,

representatives of the School conducted an interview of
ALEXANDER NEUMEISTER, the defendant, in the presence of
NEUMEISTER's attorney.  During that interview:

a.    NEUMEISTER acknowledged that he had
improperly charged certain travel-related expenses incurred on
behalf of himself and/or his family to the P-Card, including the
cost of a trip that he took to Atlantic City in July 2014
(totaling $1,397.23, which was charged to a School expense
account), as well as the cost of the above-referenced airline
tickets for his wife to travel to Vienna in January 2014 and for
him and his family to travel to Stowe, Vermont, in March 2014.

b.    NEUMEISTER confirmed that several of the
checks issued to the Friend for the Friend's purported
participation in research studies listed NEUMEISTER's
residential address at the time as the Friend's address, and
that NEUMEISTER had endorsed two of the checks for payment.
NEUMEISTER further admitted that the imaging procedures that
were listed on some of the forms authorizing payment to the
Friend for the Friend's alleged participation in the imaging
procedures had not occurred.  NEUMEISTER acknowledged that his
research staff had prepared the forms at his request with false
information that he had provided to them.

c.    NEUMEISTER admitted that it was very likely
that the Friend was the individual with whom he had dined at the
two New York City restaurants referenced above in paragraph
9(e), and that the entries in the Database indicating that
NEUMEISTER had dined with work-related collaborators could have
been a "bookkeeping error on my end."  NEUMEISTER also stated
that he recalled attending a lunch at the Waldorf in Park City,
Utah, with the Friend but not the work-related collaborator who
is identified in the Database as NEUMESITER's guest at that
meal.

d.    However, when confronted with other
apparently fraudulent expenses, NEUMEISTER continued to deny any
improper conduct.

e.    For example, NEUMEISTER continued to claim
that the Friend—who was not enrolled as a subject in any of the
studies NEUMEISTER was overseeing for the school—was a research
subject.  When confronted with his use of the P-Card to pay for
airfare for the Friend to travel to Miami, Florida, on May 13,
2014, and to stay at a resort hotel in Miami Beach, from May 13
through 22, 2014, for a total cost of more than $4,300,

11

NEUMEISTER claimed that he was attempting to generate data regarding the effects of travel stress on neuroimaging.

f.   When confronted with his use of the P-Card to pay for expenses totaling over $1,700 at a luxury hotel in Maui, Hawaii, in January 2015, NEUMEISTER claimed that he had intended to use his personal credit card to pay for those expenses, but had lost his wallet in a taxi cab on his way to the hotel.  However, upon returning to New York City, NEUMEISTER categorized, or caused others to categorize, those expenses in the Database as related to a "DOD [Department of Defense] retreat" and billable to School funds.

g.   Approximately one month after his February 18, 2015, interview with representatives of the School, NEUMEISTER resigned from his position at the School.  As of the date of this Complaint, NEUMEISTER has not repaid any of the misappropriated funds.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of ALEXANDER NEUMEISTER, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

_____
FRANK P. PAPPALARDI
Special Agent
U.S. Department of Health and Human Services
Office of Inspector General

Sworn to before me this
15th day of November, 2017

S/Kevin Nathaniel Fox
_____
THE HONORABLE KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK